# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| GERALDINE R. JAMES, as personal representative of the Estate of William Dwayne Harris, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No.:  5:14-cv-02267-SGC |
| | ) |
| CITY OF HUNTSVILLE, ALABAMA, et al., | )<br>)<br>) |
| Defendants. | ) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter arises from the death of William Dwayne Harris, following his October 25, 2012 arrest by Huntsville Police Department personnel.  Presently pending is the motion for summary judgment filed by the defendant, the City of Huntsville, Alabama.  (Doc. 37).[1]  The motion has been fully briefed and is ripe for adjudication.  (*See* Docs. 39, 44, 48).  Because the parties have not consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c), the undersigned has prepared this report and recommendation.  For the reasons that follow, the undersigned concludes the City's motion for summary judgment is due to be granted in its entirety.

---

[1] The Second Amended Complaint names two defendants: the City and Mark Hudson, the former Chief of the Huntsville Police Department.  (*See* Doc. 28).  The parties have filed a joint stipulation dismissing all claims against Chief Hudson. (Doc. 47).  Accordingly, the City is the sole remaining defendant.  (*See* Doc. 49).

I.   **FACTS**[2]

The events giving rise to this lawsuit transpired on the afternoon of October 25, 2012, as four officers with the Huntsville Police Department—Kevin Smith, Jefford Wright, Kelley Reeve, and Jeremy Putman (collectively, "Officers")—served a felony arrest warrant on Mr. Harris for first degree possession of marijuana. (Doc. 39 at 4-5).[3] Officer Putnam entered Mr. Harris's residence, hand-cuffed him, and took him into custody without incident at 3:31 p.m. (Doc. 44 at 3). Officers Smith and Reeve stayed outside the front door, and Officer Wright stayed on the street during the initial arrest. (Doc. 39 at 5). At approximately 3:32 p.m., Officer Putnam escorted Mr. Harris to the front porch, where Officer Smith asked Mr. Harris whether he was supposed to turn himself in to authorities. (*Id.*; Doc. 44 at 3). Mr. Harris acknowledged that he was scheduled to surrender the previous week but explained that he did not because he had been sick and went to

---

[2] The plaintiff has not disputed the facts set forth by the defendant. (Doc. 44 at 3). Accordingly, while viewing the facts in the light most favorable to the plaintiff, many of the citations to the record refer solely to the defendant's brief.

[3] There are conventionally-filed police video and audio recordings of the events; the video recording came from fixed cameras inside Officer Putnam's patrol car which captured images of the scene from approximately 3:35 p.m. onward. (*See* Doc. 41, Tab 3). The audio was recorded from a microphone on Officer Putnam's person. It captures audio of the entire event, except for a less-than-two-minute gap from approximately 3:32 until 3:34 p.m., as Officer Putnam walked away from the scene to retrieve his patrol car. (*See id.*; Doc. 44 at 3). Accordingly, to the extent there are clear contradictions between the audio/video and documentary evidence, the audio/video evidence will be accepted as accurate. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). However, any evidence not clearly contradicted by audio/video evidence will be viewed in the light most favorable to the plaintiff. References to specific portions of the recordings will refer to the time-signature stamp for the segment cited.

the doctor regarding his heart. (Doc. 39 at 5; Doc. 44 at 5).[4] Officer Smith told Mr. Harris a nurse could check on him when they arrived at the jail. (Doc. 39 at 5-6). Mr. Harris also asked whether bond would be set. (*Id.* at 6). Witness Brandi Seay averred that, during this conversation, Mr. Harris was breathing heavily and "visibly drenched in sweat" despite the cool fall weather. (Doc. 44 at 3).[5]

While standing on the porch, Brandi Seay put Mr. Harris's shoes on for him and brought him a shirt. (Doc. 44 at 4). According to Officer Wright, while on the porch, Mr. Harris told him he had just returned from the hospital in Birmingham and wanted to be "checked out." (*Id.*). Officer Reeves stated Mr. Harris requested to go to the hospital during the same time period. (*Id.*). Brandi Seay avers that Mr. Harris stated his chest and left arm were hurting and he was out of breath. (Doc. 45-1 at 2).

It is undisputed that, while standing on the porch, the Officers "were asked to call the ambulance three times." (Doc. 44 at 4). In response to Mr. Harris's request, an unidentified officer responded: "You've been running from us for four days, don't you think you had time to go to a doctor?" (*Id.* at 5; Doc. 45-1 at 3). An unidentified individual told the officer that Mr. Harris had not turned himself in

---

[4] The foregoing facts are also reflected in the audio recording. At this point, there is a gap in the audio evidence until further noted.

[5] The City contends the video does not support this description of Mr. Harris. (Doc. 48 at 3). However, the video evidence is inconclusive in this regard. Accordingly, Ms. Seay's testimony will be accepted as true.

because he had just returned from UAB hospital "for his heart." (Doc. 44 at 5; Doc. 45-1 at 3). Both Brandi Seay and another witness, Cinda Martens, "told the officers on the porch that Mr. Harris had a serious heart condition." (Doc. 44 at 5). Martens recalls that "it was obvious [Mr. Harris] was a very sick man." (*Id.* at 5).

Concerned about Mr. Harris's worsening condition and fearing that "something was wrong," Brandi Seay again asked the Officers to call an ambulance. (*Id.*). Officer Smith responded that Mr. Harris could see a nurse at the jail but did not call an ambulance at that time. (*Id.*; Doc. 45-1 at 3).[6] Cinda Martens also asked the Officers to call an ambulance to no immediate avail. (Doc. 44 at 6; Doc. 45-1 at 3). As the gap in the audio recording ends, an unidentified female can be heard asking about the amount of Mr. Harris's bond. An officer tells her they won't know the amount of the bond until they finish the paperwork; he instructs the individual to call the jail in approximately an hour. (Doc. 41, Tab 3 at 15:34:50-58).

As the Officers escorted Mr. Harris to Officer Putnam's patrol car, he stopped at the bottom of the porch stairs and stated he did not feel well. (Doc. 39 at 6; Doc. 44 at 6).[7] At 3:35 p.m., as the Officers continued to escort Mr. Harris toward the patrol car, he stopped about three feet short of the car and vomited.

---

[6] It appears this is the same exchange described in the second paragraph of this section.

[7] Here, Mr. Harris enters the video frame, and from this point forward the events are captured by both audio and video evidence.

(Doc. 39 at 6; Doc. 44 at 6; Doc. 41, Tab 3 at 15:35:14-45). As Mr. Harris continued coughing and wretching, an unidentified officer told him to relax. (Doc. 44 at 6). Mr. Harris stated he was "hurting and could not breathe." (*Id.*). Mr. Harris stated he had "been sick" and Officer Putnam asked if he had the flu or had eaten or swallowed anything. (*Id.* at 6-7; Doc. 39 at 6). Mr. Harris shook his head no but was unable to answer and continued to vomit while standing, bending over with his wrists cuffed behind his back. (Doc. 44 at 7). At 3:36 p.m., an unidentified officer asked if Mr. Harris wanted to go to the hospital, but he did not answer. (Doc. 44 at 7).

At 3:36 p.m., Officer Smith radioed dispatch and asked for an ambulance to respond; however, Officer Smith requested a "Code 1," meaning a response without lights and sirens. (Doc. 39 at 6; Doc. 44 at 7). Officer Smith asked Brandi Seay what illness Mr. Harris had; her response was inaudible. (Doc. 41, Tab 3 at 15:36:20).[8] Officer Smith asked Brandi Seay what medications Mr. Harris was taking and asked her to retrieve the medicine to take with them. (Doc. 44 at 7). Brandi Seay stated Mr. Harris had been out of his medications for a few days and that he was diabetic. (Doc. 39 at 7).

---

[8] The plaintiff contends Brandi Seay "again explain[ed] that Mr. Harris ha[d] a heart problem." (Doc. 44 at 7). However, the only evidence the plaintiff cites to support this contention is the audio recording. (*Id.*). Accordingly, the substance of Brandi Seay's response is not part of the summary judgment record.

The Officers continued to tell Mr. Harris to relax and that paramedics were on the way. (Doc. 44 at 8). As they waited for the ambulance to arrive, the Officers continued to question Mr. Harris regarding his illness and the last time he ate; at 3:37 p.m. Mr. Harris responded that he could not breathe. (*Id.*; Doc. 41, Tab 3). Also during this time, Officers Smith and Putnam can be heard discussing Mr. Harris's condition at the time Officer Putnam first made contact, as well as Mr. Harris's statement that he had been sick and had travelled to Birmingham due to a "heart situation." (Doc. 41, Tab 3 at 15:37:37-47).

At 3:38 p.m. the Officers sat Mr. Harris down in the back seat of the patrol car with the door open and his feet on the ground outside the vehicle so he could rest. (Doc. 39 at 7; Doc. 44 at 6). Mr. Harris informed the Officers he had taken nitroglycerin the day before and, when asked whether he needed to take any medication immediately, responded that he did not know. (Doc. 44 at 8). At 3:39 p.m. Mr. Harris slid out of the seat and crouched on the door frame and moaned before returning to his seat. (Doc. 39 at 7; Doc. 44 at 9). Approximately twenty (20) seconds later, Mr. Harris passed out and collapsed across the back seat. (Doc. 39 at 7-8; *see* Doc. 44 at 9; Doc. 41, Tab 3 at 15:39:40). Within approximately ten (10) seconds, an officer radioed dispatch and requested the ambulance to respond "Code 3," meaning with lights and sirens activated. (Doc. 39 at 7-8; *see* Doc. 44 at

9; Doc. 41, Tab 3 at 15:39:51).   From this point forward, Mr. Harris was unresponsive and gasping raggedly.

From 3:40 through 3:41 p.m., Officers Wright, Putman, and Smith removed Mr. Harris from the patrol car and placed him on the ground on his left side to prevent him from aspirating vomit.  (Doc. 39 at 8; Doc. 44 at 9). Officer Reeve removed the handcuffs, and a pillow was placed under Mr. Harris's head.  (Doc. 39 at 8).  Officer Smith continued to reassure Mr. Harris that the ambulance was almost there and told him to relax and continue breathing.  (*Id.*; Doc. 44 at 9; Doc. 41, Tab 3 at 15:40:30).  Officer Smith also asked Mr. Harris whether he had taken his diabetes medication that day.  (Doc. 41, Tab 3 at 15:40:30).  With audible sirens marking the ambulance's approach, the Officers conducted back and sternum rubs to try to stimulate Mr. Harris; the Officers also continued to encourage Mr. Harris to hold on and breathe.  (*Id.*; Doc. 39 at 8; Doc. 44 at 9).

The ambulance arrived on the scene at 3:42 p.m.  (Doc. 39 at 8).  Officer Smith informed the paramedics that he could not detect a pulse and stated Mr. Harris needed to be loaded as soon as possible.  (*Id.*).  Officer Smith also relayed his observations from the scene, including Mr. Harris's recent medical problems. (*Id.* at 8-9).  Mr. Harris was loaded onto a stretcher at 3:44 p.m., and the paramedics transported him to the hospital, where he was pronounced dead at 5:37 p.m.  (*Id.* at 9; *see* Doc. 44 at 10). The manner of death was natural, and the cause

of death was determined to be atherosclerotic and hypertensive cardiovascular disease. (Doc. 39 at 9).[9]

Based on these facts, the Second Amended Complaint asserts a claim against the City for deliberate indifference to Mr. Harris's serious medical needs under the Alabama Wrongful Death Act, asserted via §§ 1983 and 1988. (Doc. 28 at 8-9). Specifically, the plaintiff alleges the Officers ignored Mr. Harris's serious medical needs and this ignorance was pursuant to the City's policies and customs. (*Id.*).

## II.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). When considering a summary judgment motion, the court must view the evidence in the record in the light most favorable to the non-moving party. *Hill*

---

[9] The plaintiff's response includes additional facts concerning police training and procedures, to which the defendant has replied. (Doc. 44 at 10-12; Doc. 48 at 4-5). However, because the undersigned concludes there was no violation of Mr. Harris's constitutional rights, it is not necessary to set forth these additional facts here.

*v. Wal-Mart Stores, Inc.*, 510 F. App'x 810, 813 (11th Cir. 2013).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

### III.  DISCUSSION

Because the amended complaint alleges deliberate indifference to Mr. Harris's serious medical needs, the § 1983 claim is asserted through the Alabama wrongful death statute, ALA. CODE § 6-5-410, via 42 U.S.C. § 1988.  *See Estate of Gilliam ex rel Waldroup v. City of Prattville*, 639 F.3d 1041, 2047-48 (11th Cir. 2011); *Bell v. Shelby Cty., Ala.*, No. 12-2991-LSC, 2013 WL 2248247, *4 (N.D. Ala. entered* May 21, 2013).  Additionally, as a pretrial detainee, Mr. Harris's rights exist under the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment.  *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  Nonetheless, in the context of denial of medical care, the Eleventh Circuit applies Eight Amendment cases interchangeably with Fourteenth Amendment cases.  *See Hamm v. DeKalb Cty.,* 774 F.2d 1567, 1574 (11th Cir. 1985); *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).

"To prevail on a deliberate indifference to serious medical need claim, Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1306-07 (11th Cir.

9

2009) (citing *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)). Accordingly, a claim for deliberate indifference for denial of medical care includes both an objective and subjective component. *E.g. Taylor v. Adams,* 221 F.3d 1254, 1258 (11th Cir. 2000). The objective component focuses on the seriousness of the plaintiff's medical need while the subjective component concerns the defendants' awareness of the plaintiff's medical condition. *Id.*

Regarding the objective component, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mann,* 588 F.3d at 1307 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176,1187 (11th Cir. 1994)). Alternatively, a plaintiff can establish a serious medical need by showing that a delay in treatment worsened the condition. *Id.* "In either case, 'the medical need must be one that, if left unattended, poses a substantial risk of serious harm.'" *Id.* (quoting *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003)). "Whether [a] delay in treatment was tolerable depends on the nature of the medical need and the reason for the delay." *Farrow,* 320 F.3d at 1247 (quoting *Harris v. Coweta Cty.*, 21 F.3d 388, 393-94 (11th Cir. 1994)). The question of whether a delay in receiving treatment worsened an individual's condition overlaps with the causation inquiry. *Goebert v. Lee Cty.,* 510 F.3d 1312, 1329 (11th Cir. 2007). Additionally, when attempting to assert deliberate

indifference by a delay in medical care, a plaintiff must show that the delay attributable to the defendant's indifference likely caused the plaintiff's injury in order to survive summary judgment. *Id.* To make this showing, a plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *McDaniels v. Lee*, 405 F. A'ppx 557, 564 (11th Cir. 2010); *Hill,* 40 F.3d at 1188.

Here, the plaintiff has established that Mr. Harris was experiencing a serious medical need; he suffered a catastrophic cardiac event from which he did not recover. Accordingly, the issue is whether the Officers were deliberately indifferent to Mr. Harris's serious medical need. *See Mann*, 588 F.3d at 1307.

Turning to the subjective component, a plaintiff claiming deliberate indifference must show that a defendant was subjectively aware of a serious medical need and disregarded that need through conduct that is more than negligent. *Brown v. Johnson,* 387 F.3d 1344, 1351 (11th Cir. 2004). In order to have subjective knowledge of a serious medical need, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Sec. for Dep't of Corr.,* 508 F.3d 611, 617 (11th Cir. 2007) (internal quotes omitted). The defendant's knowledge is "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a[n

officer] knew of a substantial risk from the very fact that the risk was obvious." *Goebert,* 510 F.3d at 1327. Moreover, "in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Mann*, 588 F.3d at 1307 (quoting *Estelle v. Gambel*, 429 U.S. 97, 105-06 (1976)). Accordingly, even facts sufficient to establish medical malpractice would be insufficient to show deliberate indifference. *Taylor,* 221 F.3d at 1258.

Under the undisputed facts of this case, the plaintiff cannot show the Officers were subjectively aware of Mr. Harris's serious medical need. Four minutes elapsed from the first mention of Mr. Harris's unspecified heart ailment at 3:32 p.m. until the ambulance was initially called at 3:36 p.m.. While the Officers did not comply with initial requests to call an ambulance, this fact alone cannot support a claim for deliberate indifference. *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) ("The term 'delay' hardly seems to fit the facts at all; but to the extent that one could call the time involved in this case 'delay,' it was only a matter of minutes.") (reversing trial court's denial of summary judgment on plaintiff's claim for deliberate indifference); *see Mann*, 588 F.3d at 1307 (no subjective knowledge of serious medical need found where multiple witnesses stated arrestee was sick and needed to go to the hospital).

While on the porch, the Officers were aware that Mr. Harris had "been sick," suffered from an unidentified "serious heart condition," and had recently sought treatment at UAB. Mr. Harris was sweaty and breathing heavily, and Cinda Martens thought it was obvious he was a "very sick man." Mr. Harris told Officers he was having trouble breathing and that his chest and left arm hurt. However, under these facts, the failure of the Officers to recognize the seriousness of Mr. Harris's condition for four minutes was, at worst, negligent. This conclusion is bolstered by the fact that, in addition to discussing his health condition, Mr. Harris inquired about his bond. *See Mann*, 588 F.3d at 1307 (arrestee's verbal communications indicated she did not have serious medical need).

Nor was the failure to immediately request a Code 3 response deliberately indifferent. Shortly following Mr. Harris's vomiting and wretching, the Officers requested an ambulance. Mr. Harris stated that he couldn't breathe and was in pain. While waiting for EMS to arrive, the Officers inquired about Mr. Harris's condition, requested his medications, and sat him in the backseat of the patrol car to get him off his feet. Here again, a female witness can be heard inquiring about the amount of bail and discussing the necessary paper work with the Officers. As soon as Mr. Harris lost consciousness, approximately three minutes after the ambulance was initially requested, an officers requested a Code 3 response. Nothing in these facts suggest the Officers were deliberately indifferent to Mr.

Harris's serious medical need. *See Pourmoghani-Esfahani*, 625 F.3d at 1317; *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010) ("The best response to a serious medical need is not required by federal law in these cases"). To the contrary, these facts, even when viewed in the light most favorable to the plaintiff, demonstrate the Officers' growing concern over Mr. Harris's condition. *See Pourmoghani-Esfahani*, 625 F.3d at 1317 (reversing district court's denial of summary judgment where undisputed facts showed that officers acted promptly once seriousness of deceased arrestee's condition was evident). Any failure to recognize that Mr. Harris required a more rapid Code 3 medical response was, at worst, negligent.

In addition to the deficiencies noted above, the plaintiff has failed to provide any evidence to support a claim that either the four minute delay in calling an ambulance, or the further three minute delay in requesting a Code 3 response, worsened Mr. Harris's condition. The closest the plaintiff comes is an unsupported assertion that "[e]very minute in a heart situation counts" and "Mr. Harris might be alive today" if the Officers had immediately requested a Code 3 medical response. (Doc. 44 at 13). This falls far short of the "verifying medical evidence" necessary to defeat summary judgment on a deliberate indifference claim based on a delay in treatment. *Hill,* 40 F.3d at 1188; *McDaniels*, 405 F. App'x at 458-59; *see Goebert,* 510 F.3d at 1329.

For the foregoing reasons, the plaintiff has failed to show that any Officer was deliberately indifferent to his serious medical need. Here, the sole remaining defendant is the City of Huntsville. However, having determined as a matter of law that the delay in treating Mr. Harris was not deliberately indifferent, any supervisory or municipal liability necessarily fails as well. *See Beshers v. Harrison,* 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude no constitutional violation occurred."); *see also Walker*, 310 F. App'x 335, 339 (11th Cir. 2009) (claim against police chief and municipality for enacting police policies that resulted in deliberate indifference "fail because we have found that there is no underlying constitutional violation"); *see also Vineyard v. County of Murray,* 990 F.2d 1207, 1211 (11th Cir. 1993) ("Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise."). Accordingly, because there was no underlying constitutional violation, the plaintiff's claims against the City of Huntsville fail as a matter of law.[10]

## IV. RECOMMENDATION

For all of the foregoing reasons, the undersigned finds there are no genuine issues of material fact and the defendant is entitled to judgment as a matter of law. Accordingly, the undersigned **RECOMMENDS** that the defendant's motion for

---

[10] Having found no constitutional violation, it also is unnecessary to discuss the parties' contentions regarding qualified immunity.

summary judgment (Doc. 37) be **GRANTED** in its entirety and all claims asserted in this matter be **DISMISSED WITH PREJUDI CE**.

## V. NOTICE OF RIGHT TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), FED. R. CIV. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal, except for plain error. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

**DONE** this 30th day of December, 2016.

_____
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE